IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| VLADIMIR GUSINSKY, derivatively on behalf of Nominal Defendant SOUTHWEST AIRLINES CO., <br><br>    Plaintiff, <br><br> v. <br><br>CHRISTOPHER P. REYNOLDS, DAVID CUSH, DAVID J. FRISSEN, DAVID P. HESS, DOUGLAS H. BROOKS, GREGG A. SARETSKY, LISA M. ATHERTON, PATRICIA A. WATSON, PIERRE R. BREBER, RAKESH GANGWAL, ROBERT E. JORDAN, ROBERT L. FORNARO, SARAH FEINBERG, EDUARDO F. CORADO, and ELAIN MENDOZA, <br><br>    Defendants, <br> and <br><br>SOUTHWEST AIRLINES CO., <br><br>    Nominal Defendant. | Case No. 3:25-cv-01816-K |

**BRIEF AMICI CURIAE OF
CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA AND
TEXAS ASSOCIATION OF BUSINESS
IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

TABLE OF CONTENTS

Page

Table of Authorities ................................................................................................................. ii

Interest of Amici Curiae .......................................................................................................... 1

Introduction ............................................................................................................................. 2

Argument ................................................................................................................................. 4

    I.    Shareholder litigation today is rife with meritless, lawyer-driven derivative suits that have significant and lasting negative effects for corporations and their shareholders. ......................................................................... 5

        A.    The structure of, and incentives created, by derivative suits make them particularly subject to abuse by an enterprising plaintiffs' bar. .......... 5

        B.    Meritless derivative suits not only impose steep financial costs, but also stifle growth and innovation. .............................................................. 8

    II.    SB 29 ensures that only those with a meaningful stake in a company can sue on its behalf—a limitation that will facilitate business growth and economic flourishing for all Texans. ....................................................... 9

Conclusion ............................................................................................................................. 11

## TABLE OF AUTHORITIES

Page(s)

### Statutes & Legislative Materials

*Hearing on S.B. 29 before the S. Comm. on State Affairs*,
   89th Leg., R.S. (Mar. 10, 2025) ...................................................................................... 9

Senate Research Center,
   *Bill Analysis*, 89th Leg., R.S. (June 2, 2025) ..................................................................... 2

Tex. Bus. Org. Code § 21.552 ................................................................................................. *passim*

### Other Authorities

Chen Lin, Sibo Liu & Gustavo Manso,
   *Shareholder Litigation and Corporate Innovation* (Feb. 22, 2019) ................................ *passim*

Daniel R. Fischel & Michael Bradley,
   *Role of Liability Rules and the Derivative Suit in Corporate Law: A*
   *Theoretical and Empirical Analysis*,
   71 Cornell L. Rev. 261 (1986) ................................................................................. 5, 6, 8

Jennifer Senior, Jennifer Sharkey & Phil Norton,
   *The Rise of Shareholder Derivative Actions* (Gallagher 2024) .......................................... 7

Jessica Erickson,
   *Corporate Governance in the Courtroom: An Empirical Analysis*,
   51 Wm. & Mary L. Rev. 1749 (2010) ............................................................................... 6

Laarni T. Bulan & Matthew Davis,
   *Parallel Derivative Action Settlement Outcomes: 2023 Review and Analysis*
   (Cornerstone Research 2023) ......................................................................................... 7, 8

Martin Gelter,
   *Why Do Shareholders Derivative Suits Remain Rare in Continental Europe*,
   37 Brook. J. Int'l L. 843, (2012) ....................................................................................... 9

Nasdaq,
   *Nasdaq Applauds Signing of Senate Bill 29, Strengthening Texas' Standing as*
   *a National Leader in Corporate Governance and Innovation* (May 14, 2025) ............... 10

Press Release, Office of the Texas Governor,
   *Governor Abbott Signs Pro-Growth Business Legislation into Law* (May 14,
   2025) ............................................................................................................................. 2, 5

Roberta Romano,
   *The Shareholder Suit: Litigation Without Foundation?*,
   7 J. L. Econ. & Org. 55 (1991) .......................................................................................... 4

Sean J. Griffith,
   *Correcting Corporate Benefit: How to Fix Shareholder Litigation by Shifting*
   *the Doctrine on Fees*, 56 B.C. L. Rev. 1 (2015) ............................................................. 6, 7

TABLE OF AUTHORITIES
(continued)

Page(s)

Stephen J. Choi, Jessica Erickson & A.C. Pritchard,
   *Piling On? An Empirical Study of Parallel Derivative Suits*,
   14 J. Empirical Legal Stud. 653 (2017) .................................................................6, 8

Texans for Lawsuit Reform,
   *Texans for Lawsuit Reform, Texas Stock Exchange, Alliance for Corporate Excellence Laud Passage of Major Legislation Establishing Texas as Nation's Preeminent Business Hub* (May 7, 2025) ....................................................................4

**INTEREST OF AMICI CURIAE**

The Chamber of Commerce of the United States of America is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than 3 million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files amicus briefs in cases, like this one, that raise issues of concern to the nation's business community.

Texas Association of Business (TAB) is the Texas State Chamber, representing companies of every size and industry before the Texas and national government. TAB works vigorously to support business growth in Texas and to maximize employers' opportunities to grow jobs, increase wages, and give back to Texas communities. TAB's President and CEO provided testimony before both chambers of the Texas legislature in support of the legislation at issue in this case. TAB regularly files amicus curiae briefs in cases, like this one, that raise issues of concern to the Texas business community.

The Chamber and TAB seek to promote a predictable, rational, and fair legal environment for their members and for the broader business community. And many of their members are publicly traded corporations that face derivative suits brought by shareholders with only a de minimis interest in the company. The Chamber and TAB therefore have a strong interest in defending legislation that balances shareholders' opportunity to raise and address potential governance issues, on the one hand, with business innovation and economic growth, on the other.

#### INTRODUCTION[*]

Although once viewed as an important tool for aligning managers' incentives with shareholders' interests, it's now well understood that the primary beneficiary of shareholder derivative suits is neither the shareholders nor the corporation—it's the plaintiffs' bar.

Seeking to reinstate the alignment between shareholders and actions nominally pursued on their behalf and to stop unintended innovation-stifling litigation, the Texas legislature recently passed, and Governor Abbott signed into law, Senate Bill 29. Balancing "economic growth with accountability for shareholders and everyday Texans," SB 29 "sets fair thresholds for shareholder actions" and "codifies the business judgment rule," which "shield[s] directors from frivolous suits." Senate Research Center, *Bill Analysis* at 1, 89th Leg., R.S. (June 2, 2025), https://t.ly/ie4nL.

As relevant here, SB 29 allows publicly traded Texas corporations to prevent de minimis shareholders (owners of less than 3 percent of the company's shares) from bringing derivative suits on the company's behalf. Tex. Bus. Org. Code § 21.552(a)(3). By imposing a reasonable ownership threshold, SB 29 enables Texas companies to block rent-seeking plaintiffs' lawyers from bringing meritless strike suits that are nevertheless costly to defend. At the same time, it ensures that derivative suits remain a meaningful tool for shareholders (with more than a de minimis stake in the company) to enforce directors' and officers' fiduciary obligations.

SB 29 provides corporate directors and officers with "certainty that sound business judgments made in the best interest of shareholders" by shareholder-elected directors "will not be second-guessed by courts" or de minimis shareholders. Press Release, Office of the Texas Governor, *Governor Abbott Signs Pro-Growth Business Legislation into Law* (May 14, 2025),

---

[*] This brief was not authored in whole or in part by counsel for any party. No party, party's counsel, or person—other than amici, their members, or their counsel—contributed money that was intended to fund preparing or submitting this brief. *See* Fed. R. App. P. 29(a)(4)(E).

https://t.ly/W_BxX.  It places responsibility to decide what's best for a company with those who have a significant stake in that company's successes (and failures), rather than with de minimis shareholders or their attorneys.

The allegations in this case confirm that it's a textbook example of what the Legislature and Governor were targeting with SB 29.  Last summer, Elliott Investment Management spent nearly $2 billion buying up 11 percent of Southwest Airlines' 525 million shares.  In Elliott's view, Southwest could increase profits and shareholder value by adopting certain "'industry-standard commercial initiatives' like 'checked bag fees.'"  Compl. (ECF 1) ¶¶ 50–51.  This spring, the company agreed, announcing that it would begin charging bag fees—a "meaningful change" that the company believes will "create enduring and superior value for shareholders."  Compl. ¶ 76 (emphasis omitted).

In response, Vladimir Gusinsky—a serial litigant who owns 100 Southwest shares (20 one-millionths of a percent of the company, worth roughly $3,300)—sued.  Compl. ¶ 26.  Gusinsky, and Gusinsky alone, alleges that Southwest's directors breached their fiduciary duties by making the business decision to start charging bag fees.  Compl. ¶¶ 102–07, 112 (seeking costs and attorneys' fees).

In the past, Southwest would have been forced to litigate Gusinsky's claims to the detriment of the company and its shareholders.  But today, because Southwest's bylaws limit derivative suits to shareholders who own at least 3 percent of the company, his suit can be dismissed for that reason alone.  *See* Tex. Bus. Org. Code § 21.552(a)(3).

This Court should enforce SB 29 and Southwest's bylaws, and dismiss Gusinsky's lawsuit—a decision that will benefit the company, its shareholders, and all Texans.

3

**ARGUMENT**

SB 29 authorizes publicly traded Texas companies to limit derivative actions to shareholders who own at least "three percent of the outstanding shares of the corporation." Tex. Bus. Org. Code § 21.552(a)(3).

**I.** Meritless derivative litigation imposes significant costs on companies and, ultimately, their shareholders. *See* Roberta Romano, *The Shareholder Suit: Litigation Without Foundation?*, 7 J. L. Econ. & Org. 55, 57–58 (1991). The structure and design of derivative litigation, including the availability of attorneys' fees and the ease of identifying a plaintiff, makes it particularly subject to abuse. So the empirical findings—that the principal beneficiaries of derivative suits are plaintiffs' lawyers, not the company or its shareholders—are unsurprising. *Id.* at 74.

But defense and settlement costs are just the beginning. Meritless derivative litigation also stifles innovation, growth, and development. When any significant business decision will inevitably lead to costly litigation, directors understandably will hesitate before taking any risks—even those innovative risks that could lead to significant payoffs for both the company *and* its shareholders. Meritless derivative litigation keeps businesses from growing and innovating for fear that de minimis shareholders and their attorneys, who have nothing to lose and much to gain, will derail new ventures and transactions.

**II.** To address the harms of meritless derivative litigation, the Texas legislature passed, and Governor Abbott signed, SB 29. Texans for Lawsuit Reform, *Texans for Lawsuit Reform, Texas Stock Exchange, Alliance for Corporate Excellence Laud Passage of Major Legislation Establishing Texas as Nation's Preeminent Business Hub* (May 7, 2025), https://t.ly/kfHZB.

By permitting Texas corporations to block de minimis shareholders from bringing derivative suits, SB 29 takes an important step toward ending meritless derivative suits and

4

ensuring that the company's directors and officers—not de minimis shareholders or judges—are the ones making the business decisions. *See Governor Abbott Signs Pro-Growth Business Legislation*. SB 29 does this by narrowing the pool of shareholders who may bring derivative suits to those with a substantial stake in a company's success. And it ensures that potential shareholder plaintiffs have the right incentives, like looking out for the company and its shareholders, when bringing these suits. In doing so, SB 29 strikes a careful balance between economic growth and accountability for shareholders and everyday Texans.

In short, SB 29 addresses the issues created by lawyer-driven shareholder derivative suits head on, ensuring that businesses can protect themselves, and ultimately their shareholders, from the costs of meritless derivative litigation brought by plaintiffs with a near infinitesimal interest in the company. Southwest's amendment to its governance documents does just that, so this lawsuit—brought by a 0.00002 percent shareholder (and serial litigant) with little to gain and even less to lose—must be dismissed.

**I.     Shareholder litigation today is rife with meritless, lawyer-driven derivative suits that have significant and lasting negative effects for corporations and their shareholders.**

**A.     The structure of, and incentives created, by derivative suits make them particularly subject to abuse by an enterprising plaintiffs' bar.**

The very design of derivative litigation makes it ripe for abuse: "Shareholders with tiny investments can bring derivative actions on behalf of a corporation." Daniel R. Fischel & Michael Bradley, *Role of Liability Rules and the Derivative Suit in Corporate Law: A Theoretical and Empirical Analysis*, 71 Cornell L. Rev. 261, 271 (1986).

1.      As a general matter, "shareholders with the largest economic stake in a venture have the greatest effect on corporate policy," which makes sense, because they "will gain the most from good performance and bear most of the costs of bad performance." Fischel & Bradley, 71 Cornell L. Rev. at 271. But derivative litigation turns this paradigm on its head—minority

5

shareholders can sue on behalf of the entire company despite having "very little incentive to consider the effect of the action on other shareholders, the supposed beneficiaries, who ultimately bear the costs." *Id.*

Although the "defects of shareholder litigation have long been known," derivative actions have become significantly more pervasive in recent years. Sean J. Griffith, *Correcting Corporate Benefit: How to Fix Shareholder Litigation by Shifting the Doctrine on Fees*, 56 B.C. L. Rev. 1, 2 (2015) ("derivative suits attend every corporate crisis"); *see also* Jessica Erickson, *Corporate Governance in the Courtroom: An Empirical Analysis*, 51 Wm. & Mary L. Rev. 1749, 1760–62 (2010). This rise is due in large part to enterprising plaintiffs' lawyers. Although de minimis shareholders themselves "have little incentive to bring a derivative suit"—any payout would correspond to their proportionate ownership interest—the availability of attorneys' fees provides strong incentive for the plaintiffs' bar to "pursue [the suits] regardless." Fischel & Bradley, 71 Cornell L. Rev. at 271 n.26, 272.

And that is precisely what we see in practice: "Shareholder lawsuits are frequently instituted because self-interested attorneys urge the shareholders to file them," despite having "only minimal evidence indicating there is a breach of fiduciary duty." Chen Lin, Sibo Liu & Gustavo Manso, *Shareholder Litigation and Corporate Innovation* 4 (Feb. 22, 2019), https://t.ly/zHJwf. These attorneys "typically work on a contingent basis and are therefore motivated to pursue cases that will produce a settlement that generates a fee," even if that settlement doesn't yield any monetary recovery for the company or its shareholders. Stephen J. Choi, Jessica Erickson & A.C. Pritchard, *Piling On? An Empirical Study of Parallel Derivative Suits*, 14 J. Empirical Legal Stud. 653, 654 (2017); *see also* Griffith, 56 B.C. L. Rev. at 2.

6

The result is unsurprising: Plaintiffs' attorneys who "churn a mass of filings and settlement[s]" win big, and the corporate defendant is left "pay[ing] fees and expenses for both sides"—costs which are ultimately borne by its shareholders. Griffith, 56 B.C. L. Rev. at 2 (emphasis omitted); Lin, Liu & Manso, *Shareholder Litigation and Corporate Innovation* at 3 (meritless, lawyer-driven derivative actions "tend to only benefit plaintiff[s'] attorneys and impede normal business").

Making matters worse, settlement payouts from derivative litigation have "risen to new heights in recent years," and overall "risk from derivative lawsuits has been trending upward." Jennifer Senior, Jennifer Sharkey & Phil Norton, *The Rise of Shareholder Derivative Actions* 2, 6 (Gallagher 2024), https://t.ly/yoi5E. Between 2005 and 2008, derivative settlements exceeding $30 million were few and far between. *Id.* at 2. Since 2020, by contrast, sampling shows that approximately half of derivative settlements exceeded $30 million, with some settlements reaching upwards of $735 million. *Id.* It should come as no surprise that these large payouts have lasting negative effects on businesses and shareholders through increased expenses, decreased revenue, and drops in stock price.

**2.** Even more problematic are so-called follow-on derivative suits. A cottage industry has developed around monitoring securities class actions and using those allegations as the basis of a separate derivative suit. *See* Laarni T. Bulan & Matthew Davis, *Parallel Derivative Action Settlement Outcomes: 2023 Review and Analysis* 1 (Cornerstone Research 2023), https://t.ly/4GYsa (it's "not uncommon for derivative plaintiffs to allege injury to the corporation as a result of" the alleged misconduct in the parallel securities suit).

In recent years, these follow-on derivative suits have become increasingly common—and increasingly lucrative. Between 2019 and 2023, nearly half of the securities class actions that

settled had a "parallel derivative action." Bulan & Davis, *Parallel Derivative Action Outcomes* at 1. And the median attorneys' fee award in those follow-on actions: nearly $3 million. *Id.* at 2.

But more lawsuits doesn't equal better outcomes. Indeed, empirical research indicates that "parallel [derivative] suits typically result in poorer quality settlements than securities class actions, undermining the possibility that parallel suits offer meaningful additional relief to the victims of corporate misconduct." Choi, Erickson & Pritchard, 14 J. Empirical Legal Stud. at 654–55.

What's more, the recent trend in large derivative settlements only further incentivizes plaintiffs' firms to challenge every big-dollar contract, compensation package, and strategic business decision that a company makes—regardless of the merits—in the hopes of receiving a large attorneys' fees payout (and for little effort at that). *See* Choi, Erickson & Pritchard, 14 J. Empirical Legal Stud. at 655 (finding that the "vast majority" of derivative action settlements involved corporate governance reforms and no monetary recovery, and that such settlements aren't "the product of extensive work by attorneys, but [are] instead being used to justify fees").

In practice, "the real party in interest" in derivative litigation isn't the company or its shareholders—it's "the attorney." Fischel & Bradley, 71 Cornell L. Rev. at 271 n.26.

**B.     Meritless derivative suits not only impose steep financial costs, but also stifle growth and innovation.**

The negative impacts of frequent, meritless shareholder litigation adds up quickly. And the Damoclean sword of derivative lawsuits demonstrably chills corporate directors from innovating and furthering business interests. *See generally* Lin, Liu & Manso, *Shareholder Litigation and Corporate Innovation*.

The problem of de minimis shareholders interfering with, second guessing, and ultimately derailing reasoned business decisions is pervasive. Board members are well aware that any significant decision—from business strategy to executive compensation to mergers and

8

acquisitions—exposes the company and its directors to attorney-driven derivative litigation brought by de minimis shareholders. *See* Lin, Liu & Manso, *Shareholder Litigation and Corporate Innovation* at 3–4 & n.6.  And this threat of suit (coupled with ever-increasing costs of litigation), makes it more likely that corporate managers and directors will "play it safe" and not take any business risks—regardless of the merit of the underlying litigation.  *Id.* at 4.

II.  **SB 29 ensures that only those with a meaningful stake in a company can sue on its behalf—a limitation that will facilitate business growth and economic flourishing for all Texans.**

With SB 29, the Texas legislature responded to address the problems with shareholder derivative litigation and its negative impacts on business growth and innovation.  Before SB 29, any shareholder—even shareholders with as little as one share in a corporation—could bring a derivative suit on behalf of the company.  Now, Texas corporations can limit who can sue to those with a meaningful stake (at least 3 percent) in the company.  *See* Tex. Bus. Org. Code § 21.552(a)(3).  That means only those with real skin in the game can sue on the company's behalf.

That was exactly the Texas legislature's design.  As the bill's sponsor, Senator Hughes, explained on the Senate floor, SB 29 permits corporations to stave off "frivolous claims"—"letting [business] leaders focus on growth and not litigation."  *Hearing on S.B. 29 before the S. Comm. on State Affairs*, 89th Leg., R.S. at 3:18:44–50 (Mar. 10, 2025), https://t.ly/HnLN3 (statement of Sen. Hughes).

One of the ways it does this is by allowing corporations to impose a reasonable standing threshold for shareholders to bring derivative lawsuits over governance disputes.  *See* Tex. Bus. Org. Code § 21.552(a)(3).[1]  Proponents have rightly recognized that SB 29 "strengthens Texas'

---

[1] By way of comparison, many countries in continental Europe also require shareholders to meet minimum ownership thresholds—between 1 and 10 percent—to bring derivative actions.  *See* Martin Gelter, *Why Do Shareholders Derivative Suits Remain Rare in Continental Europe*, 37 Brook. J. Int'l L. 843, 859 tbl. 1 (2012).

9

position as a global center for capital formation" by balancing "economic growth with investor confidence" and making Texas "a national model for innovation-driven policy." Nasdaq, *Nasdaq Applauds Signing of Senate Bill 29, Strengthening Texas' Standing as a National Leader in Corporate Governance and Innovation* (May 14, 2025), https://t.ly/nD2Yj.

To be clear, SB 29 doesn't shield corporate misfeasance or abdication of fiduciary obligations. It permits the company to require that shareholders who purport to bring suits on the company's behalf actually have a meaningful stake in the company. In doing so, SB 29 helps weed out meritless strike suits brought by de minimis shareholders, driven by plaintiffs' lawyers.

This modest yet important change advances economic flourishing for companies and shareholders—allowing them to reap their hard-earned rewards and contribute to the State and nationwide economies, rather than lining attorneys' pockets. SB 29 benefits all Texans and serves as a model for other states that seek to grow and innovate.

*   *   *

SB 29 acts as a check on meritless, lawyer-driven derivative suits—and one that's been sorely needed. With practically no cost to bring suit, a shareholder with nearly no interest in a company has the power to subject the company (and its shareholders) to costly, frivolous litigation over any even arguably significant decision the company makes—acquisitions, changes in leadership, or even shifts in business strategy. The only winners are plaintiffs' attorneys, who recover exorbitant fees—while shareholders receive next to nothing, and the company ends up picking up everyone's tab. And the mere threat of shareholder derivative suits alone has a chilling effect that stifles business innovation.

This suit is precisely the type of case SB 29 was designed to end: a meritless, lawyer-driven suit nominally on behalf of the company brought by someone who owns less than 1/1,000th

of the company. Dismissal is required under the plain text of SB 29 and Southwest's bylaws—and will benefit the company, the owners of the remaining 99.99998 percent of its shares, and Texans more broadly.

## CONCLUSION

For these reasons, and the reasons provided by defendants, the Court should grant defendants' motion to dismiss.

Dated: September 2, 2025

Respectfully submitted,

*/s/ Bradley G. Hubbard*
Bradley G. Hubbard, State Bar No. 24090174
Benjamin D. Wilson, State Bar No. 24084105
Jaime R. Barrios, State Bar No. 24139042
  (motion for admission forthcoming)
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas 75201
Telephone: 214.698.3100
Facsimile: 214.571.2900
*BHubbard@gibsondunn.com*
*BDWilson@gibsondunn.com*
*JBarrios@gibsondunn.com*

*Attorneys for Amici Curiae*
*Chamber of Commerce of the United States of America and Texas Association of Business*